Good morning. I'm Betsy Stevens for the appellant Jennifer Teran. Can you tell us what's going on in terms of the representation? Well, Your Honor, the lead counsel, Ms. Bossovan, apparently had a family reunion in Virginia and couldn't be here, and so she asked me to step in for the oral argument. Well, wasn't that scheduled, the family reunion that travel attended to, wasn't that scheduled before you received notice that this case was calendared for argument? I really don't know, Your Honor. Here's the sequence. I understand if you know something about this, fine. If you don't, fine. First of all, is it Bossovan? I think so. Ms. Bossovan moved to submit the case on the record, and the clerk contacted her to determine if there were economic reasons for not wanting to argue and to offer the availability of telephonic or video argument. We were told that was not a problem, economics was not the problem, and then she moved again to have argument, the case not argued, and talked about these planned travel, but the gist we received is that she knew about this planned travel and could have advised the court much earlier. Do you know anything about that? I've never actually met Ms. Bossovan, Your Honor, and I have no idea what she knew or when she knew it. But she called you and asked you to appear today? She asked me through another attorney who actually wrote the briefs. Who was that? That was Ralph Wilborn, and I'd write briefs for him and his brother, and they contacted me and asked me to come and do this. Are you a member of the Ninth Circuit Bar? Yes, Your Honor. And where are you admitted to practice? In New Mexico and Arizona. Okay. So you really know nothing about this? Nothing at all, Your Honor. Do you know that this court ordered Ms. Bossovan to personally appear at argument? I had no idea. You've not seen that order? No, sir. Okay. Well, why don't you proceed to argue as best you can, and the court will deal, and I assure you, it will deal with these other matters. Okay. Please proceed. Okay. May it please the court, this is a social security disability case, and there are a number of issues and they've been pretty thoroughly briefed, so I thought I would just address, unless the court has specific questions, just a couple of things briefly. The first thing is that we're seeking remand for payment of benefits based on the treating rheumatologist, Dr. Watrous' opinion, and Dr. Watrous was the only doctor in the record to address the claimant's fibromyalgia, which is one of her four severe impairments, and he opined that she could not sustain even sedentary work on a regular and continuing basis, and the ALJ improperly rejected that opinion. And secondly, the ALJ improperly rejected the claimant's own testimony and also the lay witness testimony of Ms. Turan's husband. And only if the court does not agree with those three points would we hope that the court would address our argument A, which is that the ALJ found at step two that the claimant has two severe mental impairments, anxiety and depression, and that she has moderate limitations in her ability to sustain concentration, persistence, and pace. And the ALJ's ultimate RFC finding limited the claimant to simple routine work, and at step five he found that she could perform the full range of unskilled sedentary employment. And we don't believe that that accurately captured the ALJ's finding of moderate limitation in concentration, persistence, and pace. Let me ask you about that. I guess the ALJ made an explicit finding that your client had moderate impairments, correct? Yes. In concentration, persistence, and pace. Yes. It also appears that there were two doctors. I think it was Drs. Hirakawa and Middleton, to the extent they addressed these areas. Both concluded that your client had only mild impairments in concentration, persistence, and pace. I found that interesting that the ALJ went one step further than what the doctors were recommending. And I'm just curious. Suppose the ALJ had made a factual finding that Theron actually only had mild impairments in concentration, persistence, and pace. Would that finding have been supported by substantial evidence? Well, would you be challenging that? I believe we would be because she has two severe mental impairments and that a severe impairment, by definition, causes significant work-related limitations. And had the ALJ found that she was only mildly limited in each of those Paragraph B categories, then she would not have had a severe mental impairment. I mean, the Step 2 finding wouldn't have existed. She wouldn't have been found to have a severe mental impairment at all if she was only mildly limited in each category. It was unclear to me from the record whether Dr. Bug, who I think is the state RFC examiner, did he ever actually examine Ms. Theron? If he was the state agency physician, then no, he did not. He reviewed the medical record that he had at the time. And the state agency opinions, I believe, were given before the treating doctor, Dr. Watrous, issued his opinion. So they didn't have the chance to review that. Thank you. Unless the court has any further questions. Well, you are asking the panel, at least I think in the briefs, to remand this case for an immediate award of benefits. If we did that, what would be the onset date? Well, I believe her alleged onset date was April 28, 2005. But doesn't Dr. Watrous suggest the date is May 2008? Well, that's when he issued his opinion. I guess he didn't treat her in 2005. I don't think he began treating her until 2007. So to reconcile that discrepancy, would we decide that? Or would we remand that to the LJ? If we thought there was a discrepancy as to onset date, what's the proper course for the Court of Appeals? Well, if you believe that the onset date was a later date, then . . . No, if we think the record is unclear as to the onset date, isn't the proper modality to send it back for that determination? Well, yes, Your Honor. If there's a discrepancy, then the agency would have another chance to decide. I think I have no other questions. Looks like you're going to have lots of time for rebuttal. Thanks. Thank you. Good morning, Your Honors. I'm Gerilyn Gulseth, representing the Commissioner of Social Security. In this case, the ALJ reasonably assessed the evidence to find that the claimant had a sedentary residual functional capacity and that she was limited to simple routine work. I just wanted to address two points that was made by claimant's counsel, the first one being the ALJ's finding with respect to the moderate limitation and concentration, persistence, and pace. It is true, as Your Honor pointed out, that two reviewing physicians . . . and that Dr. Hirakawa, the consultative examining psychologist, had found all mild limitations. The ALJ, however, on transcript page 18, explained why he was finding the moderate difficulties in concentration. So he was sort of going above and beyond what the medical evidence showed. And he was, to some extent, kind of giving the claimant the benefit of the doubt in terms of her subjective symptoms of depression. Excuse me. Just one second. Is the clock on? Go ahead. The timer was not on. Sorry. And that's why he found the moderate difficulties. He said that the depression, combined with some of her physical symptoms, may affect her ability to focus on more complex tasks. And therefore, he limited her to simple routine tasks. So he himself defined what he was doing when he imposed that moderate difficulty in concentration, and he accounted for it in the residual functional capacity. So the claimant's argument sort of . . . There seems to be a little inconsistent, but maybe it's not. Maybe that's what you're talking about right now, because the ALJ didn't, I guess, rely on those two doctors' recommendation when it came to mild versus moderate. But then it seems like on the RFC determination, you argue that that was not defective because Drs. Herakoa and Milton both found Ms. Turan had only mild mental impairments.  Well, I think where sort of the analysis begins is a residual functional capacity is based on all the relevant evidence in the record. So an ALJ can look at non-medical evidence. He can look at medical evidence. He can look at what we call medical source opinions. Can he pick and choose? He can, actually, when he's assessing residual functional capacity, as long as his determination is supported by substantial evidence. So he can make a finding of, for example, severe chronic fibromyalgia, which is what he did, right? Yes, he did find that a severe impairment. Only one doctor, the rheumatologist, said that. Is that correct? I think there was another doctor who diagnosed fibromyalgia, but yes. So let's assume there's just one, the rheumatologist. He can accept the doctor's determination diagnosis of severe fibromyalgia but reject the rest of the doctor's determinations? Certainly, yes. Otherwise, a doctor's diagnosed impairment would translate to disability per se, and that's just not the case under the Social Security Act. The ALJ is authorized as the finder of fact to determine if medical impairments have been established, and they have in this case, and whether they're severe. And severe is a term of art in the Social Security world. It really only means mild or mildly affects your ability to engage in basic work activities. And then in assessing the residual functional capacity, both mental and physical, the ALJ, again, looks at the entire record. Medical source opinions, what doctors say, is one part of that. Now, of course, in order to reject a doctor's opinion, like a treating doctor, an ALJ must give valid reasons, but certainly he can reject portions of an opinion or all of an opinion if it's not supported by the evidence. Here, I think the ALJ was being sort of generous in limiting the claimant to simple tasks because he was basing that sort of on her subjective complaints, even though Dr. Hirakawa found at least a less restrictive mental functional capacity. Hirakawa never saw her, right? No, Hirakawa did. He was a psychologist who examined her in March of 2007. Dr. Middleton was the reviewing mental health consultant. Dr. Bug and Dr. Wong were the reviewing physicians who assessed her physical functioning, and they reviewed the record but did not lay hands on the claimant. They did not examine her. The ALJ thought she was untimely in reporting this? Well, I think the timelines in these cases are very, very significant. I think what the ALJ was faced with was basically a two-year period of the claimant complaining of low back pain and getting conservative treatment for it, in the meantime pointing out that she was taking care of her children, and by mid-2007 she was exercising daily. She had lost weight. She had a more positive outlook. This was a result of this program, a conservative program for her low back pain. And then a few months later she comes in to Dr. Cooper and says, I've been reading the Internet and I think I have fibromyalgia. So I think that's what... What she did? Well, yes, she did then go see Dr. Watrous in January of 2008, and he diagnosed fibromyalgia. But when you look at his treatment notes, there really wasn't a lot there. And granted, fibromyalgia has a large subjective component to it, but when you read through his treatment notes, she's not coming in saying, you know, I can't stand this pain anymore or anything like that. He found mild tender points. Otherwise her examinations were fairly normal. She responded fairly well to a sleep medication he prescribed her. She was sleeping better and had more energy. Did the ALJ give specific cogent regions for rejecting Ms. Teran's testimony? He did. He primarily talked about her daily activities, which were inconsistent with his. How were they inconsistent? Because I guess I just didn't see where her daily activities contradicted her other testimony or how they were not transferable or transferable to a work setting, which I think you have to look at, isn't it? I mean, whether the daily activities can be transferred to a work setting. That's one component of looking at daily activities, but according to... And the other is it has to contradict her testimony. Yes, it can be an inconsistency. Can you highlight for me how that was supported by the ALJ? Well, the claimant testified that she had difficulty with sitting and standing longer than five minutes, and her daily activities, just sort of a reasonable interpretation of them, necessarily indicate that she probably was doing more than five minutes of sitting or standing at a time. She was taking her children to school and caring for her toddler. She was going to the gym in 2007 and exercising every day. She had very extreme limitations that were just belied by her daily activity level. I'm not sure that that's inconsistent with having trouble sitting or standing for more than what it was five or ten minutes. Isn't that what she said? Yes. Well, I think, again, the ALJ's assessment of all of the evidence has to be the entire record and sort of what his perspective was in terms of the chronology of this young woman's problems were. She first sought out treatment for low back pain, which turned out to be a pretty mild disc disease. She was treated conservatively for it, responded at least fairly well mood and energy-wise to that treatment, had lost weight and was going to the gym, taking care of her kids. There were references to she was active with her kids and taking care of the house. And then she shows up with fibromyalgia in 2008. But even if you look at Dr. Watrous' treatment notes, they're very minimal. She responded fairly well to the medication he prescribed her. How was her doctor diagnosed that she had fibromyalgia? Who was the other doctor? Yes. I believe it was Dr. Cooper in October of 2007. That's when she came in and said, I've been reading the Internet and I think I have fibromyalgia. And he referred her to a rheumatologist. I don't know if he referred her at that point, I think. But definitely, Dr. Watrous is a rheumatologist. But I don't know technically who referred her at that point. But I think the ALJ was looking at the longitudinal record here. I mean, in addition to the daily activities that he was pointing out and the daily activities that she described them to Dr. Hirakawa during her consultative psychological exam, he noted that even though she claimed disability as of April 2005, she didn't have any notable low back complaints until early 2006. This was a couple of months after she gave birth to her youngest child. And then the record is, just in terms of the objective findings, that the back impairment is fairly benign. Dr. Cooper said, you know, there's not much here to worry about. Dr. Holvick, her first primary treating physician, said that she had mild disc disease. And then all of a sudden, in October 2007, we have fibromyalgia. And fibromyalgia doesn't necessarily mean you're disabled, just because a doctor diagnoses you with fibromyalgia. Again, his treatment notes have to be looked at. It seems like her husband's testimony would have been important. And I don't believe that ALJ addressed her husband. He rejected it. I don't think he – did he reject it, or did he even address it? Well, he didn't expressly discuss it in the decision, so that is true. The husband had submitted a questionnaire describing that Clayman had physical limitations, and there's no dispute that the Clayman has physical limitations. The ALJ found that, and he found her only capable of sedentary work, which is a very low level of, you know, physical demands. But in any case – Didn't you acknowledge in your brief that the ALJ erred in this regard? He should have addressed the husband's testimony. There was an error, but it was harmless because the husband's testimony was cumulative to the Clayman's testimony. Well, I thought that the failure to address lay testimony is harmless if a reasonable ALJ fully crediting the lay testimony might have reached a different disability determination. Is that the right standard? Did I say that right? Under Stout, yes, that's correct. So wasn't the husband's testimony consistent with Ms. Teran's? Couldn't that mean that it would have bolstered her credibility, which the ALJ questioned? But his – well, there are two points. I mean, under a subsequent case, Molina v. Astru, the court held that an error, an ALJ's failure to expressly cite a lay witness's statement was harmless, where the lay witness's statement was simply cumulative to the Clayman's testimony. But the ALJ didn't say that here. It didn't say that the husband's testimony was supplemental or unnecessary. It just didn't talk about it. Well, he did consider all the evidence of the record, but no, he didn't expressly talk about it, but neither did the ALJ in Molina. I mean, that's exactly why there's an error, but the point being that it was harmless. Even if you look at the husband's questionnaire, though, I mean, he was describing that she was taking care of the kids and doing some housework, and yes, she had limitations, so I don't know necessarily that – I guess I'm trying to figure out how doing housework is inconsistent with not being able to stand or sit for more than five minutes, because most women I know who do housework, you're not sitting around and standing in one place for five or ten minutes. Well, I think that's the point, though. I mean, I think the ALJ was finding that based on her activities, she was more capable than she was testifying to. Well, but it's not inconsistent to what she said her problem was. Her problem was with her back and I guess her fibromyalgia. Her problem was sitting for more than five minutes, standing for more than five minutes, but I don't know that that's inconsistent with moving around, but maybe I'm wrong. I'm just giving you an opportunity to address it because that seems like this hinges on whether or not his findings were inconsistent with what she said. Well, I think if she's driving her children to school and back, and that's going to require some sitting and probably longer than a few minutes, she's going to the gym, that's going to require some standing and walking. Caring for a one, two, two-and-a-half-year-old through the span of the period under review, your old baby and then toddler is probably going to require more than five minutes of sitting and standing. All right. Thank you very much. Thank you. Thank you. Okay. I would just like to point out that the claimant never said that she could not sit for more than five minutes at a time. She said she could not sit for more than five minutes without pain. She said she could sit longer if she had to, but it would hurt. And so I don't think that that's inconsistent with the activities the ALJ cited. And the bottom line here is what the ALJ found, that she has severe impairments, including fibromyalgia, and the ALJ did not provide clear and convincing reasons for rejecting Dr. Watrous' medical statement or for rejecting the claimant's testimony, and he didn't even discuss the lay witness testimony. And as you were saying earlier, it's not harmless error to fail to discuss the lay witness testimony if that testimony bolstered the claimant's own testimony. And the vocational expert testified that with the limitations Dr. Watrous described and with the limitations the claimant described for herself, that such a person could not sustain even sedentary work activity. That's all I have. Thank you. Thank you. Thank you for your arguments presented. The case is submitted.
judges: Fletcher, Hawkins, Murguia